**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Melanie Taylor, Appellant,

v.

Converse College, Respondent.

Appellate Case No. 2011-197947

―――――――――――

Appeal From Spartanburg County
J. Derham Cole, Circuit Court Judge

―――――――――――

Unpublished Opinion No. 2012-UP-601
Submitted October 1, 2012 – Filed November 7, 2012

―――――――――――

**AFFIRMED**

―――――――――――

Nancy Bloodgood and Lucy Clark Sanders, both of
Foster Law Firm, LLC, of Daniel Island, for Appellant.

Thomas H. Keim Jr. and Lucas James Asper, both of
Ford & Harrison, LLP, of Spartanburg, for Respondent.

―――――――――――

**PER CURIAM:** In this employment matter, Melanie Taylor appeals from the circuit court's grant of summary judgment in favor of Converse College. We affirm.

## FACTS/PROCEDURAL HISTORY

In April 1997, Appellant Melanie Taylor was offered the position of Assistant Professor of Piano Pedagogy at Converse College.[1] Before Taylor accepted Converse's offer of employment, she received and reviewed a copy of the Faculty Handbook. Every year, the President of Converse sent Taylor a letter stating her salary for the coming year. Each letter advised Taylor: "As always, the terms of your employment are controlled by the provisions of the College By-Laws and the *Faculty Handbook*."

In 2003, Converse granted tenure to Taylor and promoted her to Associate Professor of Piano Pedagogy. At the time of Taylor's promotion and grant of tenure, the 2002-2003 Faculty Handbook explained the College's policy governing termination and dismissal of tenured faculty.[2] Section VII of the Faculty Handbook, entitled "Termination of Employment," stated the conditions under which Converse could terminate the employment of a tenured faculty member.

> In order to preserve institutional integrity, the employment of a faculty member on tenure or one whose term contract has not yet expired may be terminated at any time for the following reasons: financial exigency, curricular exigency (which includes such reorganization of the academic structure as may eliminate the department or discipline of the affected faculty member), medical circumstances, or cause.

Section VII of the Faculty Handbook further explained that a majority vote of the Board of Trustees was required to dismiss a tenured faculty member.

> In order to preserve institutional integrity, the Board of Trustees may remove any faculty member at any time by a majority vote. Such a dismissal may be only for financial exigency, curricular exigency, medical circumstances, or cause.

---

[1] Piano pedagogy is the teaching of students to become piano teachers.

[2] Subsequent Faculty Handbooks contained the same policies and procedures regarding termination and dismissal of tenured faculty.

During 2008, Converse's endowment experienced a decline of 33%, and a budget deficit of $1.8 million was projected for the 2009-2010 academic year. Susan Stevenson, Chief Financial Officer at Converse since 2005, explained: "Converse lost 33 percent in our endowment during the drop-off in the investments in the stock market." Stevenson added that Converse had enrollment concerns, including "issues with our students' families having lost their income and being able to pay for tuition."

In November 2008, the Executive Committee of the Board of Trustees instructed President Elizabeth Fleming to develop various proposals for "organizational and operational changes at Converse in an effort to ensure the long-term viability and success of the College." President Fleming was asked to present these proposals to the Board at their April 2009 meeting. In response to the Executive Committee's directive, President Fleming appointed three task forces.

The Academic Programs Task Force (APTF) was comprised of the Vice President of Academic Affairs, tenured faculty members, administrators, and a facilitator. In January 2009, President Fleming issued written directives to the APTF and instructed the Task Force to submit its proposals for reorganization to her by April 9, 2009. Specifically, the APTF was asked to recommend 1-3 reorganization models for academic programs. President Fleming required the following "deliverable" from the APTF: "Develop[] recommendations that involve fewer positions; fewer separate and distinct programs, majors, and departments; increased student: faculty ratio; and a different organizational structure that both reduces costs and positions the College for strategic growth."

On April 9, 2009, the APTF presented President Fleming with two reorganization models. Both models recommended eliminating several academic majors, including the piano pedagogy major.[3] Board Chairman William Webster testified that the Board unanimously approved President Fleming's proposed Reorganization Plan on April 24, 2009. Webster stated:

> [T]he Board, with members of the Academic Affairs
> Committee in attendance and voting, unanimously
> approved and authorized President Fleming to implement
> the Reorganization Plan with full knowledge that the

---

[3] At the time the APTF reviewed student enrollment numbers by major, only one student had declared piano pedagogy as her major. Between 2004 and 2007, a total of six piano pedagogy majors had graduated from Converse.

Plan would result in the elimination of majors, the integration of departments, the relocation of functions serving students, the reduction and elimination of certain positions, and the reductions of salary for senior-level employees.  The Board specifically understood at this time that the Reorganization Plan would result in the phasing out of eight major programs—French, Modern Languages, Computer Science, Computer Science and Mathematics, Music Performance – Organ, Piano Pedagogy (BA and MA), and Music Business—and the elimination of seven faculty positions in the coming years, with four faculty members being offered phased-out employment or phased-out retirement opportunities.  In order to implement the Reorganization Plan, the Board authorized and directed President Fleming to extend generous offers of phased-out employment or phased-out retirement to the faculty members affected by this Plan.

On May 1, 2009, President Fleming offered a phased-out employment plan to the four faculty members, including Taylor, who would be affected immediately by the Reorganization Plan.  The phased-out employment plan offered Taylor the opportunity to continue teaching full-time during the upcoming 2009-2010 academic year and to teach 50% time during the 2010-2011 and 2011-2012 academic years.  While Taylor's compensation was to be reduced at the end of the 2009-2010 academic year, Converse offered to maintain Taylor's full benefits through the 2011-2012 academic year.  Taylor declined Converse's offer of phased-out employment.

On June 2, 2009, the Board approved a motion "expressly approv[ing] and ratify[ing] the selection" of the four faculty members affected by the Board's approval of the Reorganization Plan.  The Board additionally passed the following motion:

Because the reduction or elimination of the Associate Professor Piano Pedagogy position currently occupied by Dr. Taylor was a key component of the Board-approved Reorganization Plan, her failure to participate in a phased-out employment plan leaves the Board no choice but to terminate her employment.  Accordingly, I ask for a motion that the Board provide President Fleming with 30 days to attempt to negotiate a phased-out employment

plan with Dr. Taylor. If Dr. Taylor fails to agree to such a phased-out employment plan, President Fleming shall have the authority to notify Dr. Taylor that she will be removed from her position and terminated from employment on August 31, 2010, for curricular exigency.

Also, the Board authorized Taylor's continued employment as a "full-time tenured faculty member" during the 2009-2010 academic year.

On July 16, 2009, Taylor filed a grievance pursuant to Section VII of the Faculty Handbook. The Grievance Committee conducted a hearing on August 17, 2009. Thereafter, the Grievance Committee found "that the grounds of Dr. Taylor's grievance are not supported and recommended that the grievance be resolved in favor of President Fleming." In a letter dated September 1, 2009, William Webster, Chairman of the Board of Trustees, informed Taylor and President Fleming of the Committee's decision, stating: "I hereby adopt the recommendations of the Grievance Committee and deny Dr. Taylor's grievance in whole." Webster's letter explained:

> The Board unanimously approved the proposed reorganization plan and directed President Fleming to implement the plan. President Fleming implemented the plan as directed, which led to the elimination of the Piano Pedagogy major. Based on the elimination of the Piano Pedagogy major, there existed curricular exigency sufficient to warrant the Board's decision to terminate Dr. Taylor's employment. Thus, President Fleming and the Board acted within the parameters of the Handbook in terminating Dr. Taylor's employment, and Dr. Taylor's grievance is denied accordingly.

Webster's letter concluded: "This is the precise type of action that must have been envisioned in drafting the Handbook provisions allowing the Board to take measures such as those that have affected Dr. Taylor 'in order to preserve institutional integrity.'"

On October 13, 2009, Taylor filed a complaint requesting a declaratory judgment and temporary and permanent injunctions; she additionally alleged actions for breach of contract, breach of contract accompanied by a fraudulent act, fraud in the inducement, and intentional misrepresentation. Both parties filed motions for summary judgment. Prior to the hearing on the parties' motions for summary

judgment, the parties submitted memoranda accompanied by extensive exhibits and deposition testimony.  On September 17, 2010, the circuit court conducted a hearing on the parties' motions for summary judgment.  Several months after the hearing, Taylor filed a "notice of additional fact relevant to [her] motion for summary judgment."  In this notice, Taylor asserted that Converse had hired an adjunct professor to teach piano pedagogy classes.

On August 2, 2011, the circuit court granted summary judgment in favor of Converse on each of Taylor's claims, and the court denied Taylor's motion for summary judgment.  This appeal followed.

## ISSUES ON APPEAL

1. Did the circuit court err in granting summary judgment in favor of Converse College on Taylor's claims of breach of contract and breach of contract accompanied by a fraudulent act?

2. Did the circuit court err in granting summary judgment in favor of Converse College on Taylor's claims of fraud and intentional misrepresentation?

## LAW/ANALYSIS

### 1.    Breach of Contract Claims

Taylor contends the trial court erred in granting summary judgment in favor of Converse on her breach of contract claims.  We disagree.

"To recover for a breach of contract, the plaintiff must prove: (1) a binding contract; (2) a breach of contract; and (3) damages proximately resulting from the breach."  *Manios v. Nelson, Mullins, Riley & Scarborough, LLP*, 389 S.C. 126, 146, 697 S.E.2d 644, 655 (Ct. App. 2010) (citing *Fuller v. E. Fire & Cas. Ins. Co.*, 240 S.C. 75, 89, 124 S.E.2d 602, 610 (1962)).

> To maintain an action for breach of contract accompanied by a fraudulent act, a plaintiff must prove three elements: "(1) *a breach of contract*; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach."  *Conner v. City of Forest Acres*, 348 S.C. 454, 465-66, 560 S.E.2d 606, 612 (2002).  "Fraudulent act" is broadly defined as "any act

characterized by dishonesty in fact or unfair dealing." *Id.* at 466, 560 S.E.2d at 612.

*RoTec Servs., Inc. v. Encompass Servs., Inc.*, 359 S.C. 467, 470, 597 S.E.2d 881, 883 (Ct. App. 2004) (emphasis added); *see McCullough v. The Am. Workmen*, 200 S.C. 84, 95, 20 S.E.2d 640, 644 (1942) (distinguishing between "a simple breach of contract" and "fraud in the breach of the contract").

Taylor identities several areas in which she contends Converse breached the parties' contract. Taylor argues: (1) the Board of Trustees had no authority to offer "phased out" employment to a tenured professor; (2) the circuit court failed to consider the sequence of events leading to her employment termination; (3) there was no evidence that the Board removed her from her tenured position due to "curricular exigency"; (4) the circuit court ignored the clear language of the contract; and (5) the subsequent hiring of an adjunct professor to teach piano pedagogy was a violation of the terms of the Faculty Handbook.

The circuit court found, and the parties agreed, that the Faculty Handbook "constitute[d] a contract" between Taylor and Converse College. However, in finding that Converse had not breached its contract with Taylor, the circuit court stated:

> [T]aylor has failed to identify a single provision from within the Handbook—the "contract" that Converse allegedly breached—that she can prove Converse violated through its decisions to remove her from employment on the basis of curricular exigency. To the contrary, the express provisions of the Handbook demonstrate that Converse has acted in accordance therewith.

We agree with the circuit court's determination.

Article I, Section 2 of the Converse College Bylaws states that "Converse College shall be governed by a Board of Trustees." Taylor's arguments fail to acknowledge that the Board of Trustees has the express power to terminate the employment of a tenured faculty member when one of four specific circumstances exists. The Board's authority to terminate a tenured faculty member is unambiguous and is clearly stated at the beginning of Section VII of the Faculty Handbook:

> In order to preserve institutional integrity, the employment of a faculty member on tenure or one whose

term contract has not yet expired may be terminated at any time for the following reasons: financial exigency, curricular exigency (which includes such reorganization of the academic structure as may eliminate the department or discipline of the affected faculty member), medical circumstances, or cause.

This section of the Faculty Handbook also explains the procedure for dismissing a faculty member with tenure: "In order to preserve institutional integrity, the Board of Trustees may remove any faculty member at any time by a majority vote. Such a dismissal may be only for financial exigency, curricular exigency, medical circumstances, or cause."

In sum, there is no question that the Bylaws granted the Board of Trustees absolute authority to address the urgent and challenging issues facing the College during a severe financial downturn. In November 2008, the Board, under its authority to govern Converse, properly directed its President to develop proposals for ensuring "the long-term viability and success of the College." The urgency then facing the Board is evidenced in its requirement that the President present recommendations at the April 2009 meeting of the Board. The Reorganization Plan was unanimously approved by the Board, which included the members of the Board's Academic Affairs Committee. The approved Reorganization Plan necessitated the phasing out of eight major programs, including the BA and MA Piano Pedagogy majors. This phase-out of eight curricular programs constituted the "curricular exigency" that is referred to in the Faculty Handbook as a condition under which the employment of a tenured faculty member may be terminated. In June 2009, the Board passed a motion that expressly required the termination of Taylor's employment—"for curricular exigency"—if a phased-out employment plan could not be negotiated with her.

There is no evidence to support Taylor's claim that Converse breached any obligation it owed to her pursuant to the Faculty Handbook. The Bylaws vest the complete and unlimited power of governance in the Board of Trustees (Article 1, Section 2). Because there are no limitations on the Board's power to govern Converse, and because the Board followed the termination and dismissal procedures outlined in the Faculty Handbook in terminating Taylor's employment, the trial court properly granted summary judgment in favor of Converse on each of Taylor's breach of contract claims. Moreover, because there was no breach of contract, Taylor's action for breach of contract accompanied by a fraudulent act must fail.

Accordingly, the circuit court properly granted summary judgment in favor of Converse on Taylor's claims for breach of contract and breach of contract accompanied by a fraudulent act.

## 2.     Fraud in the Inducement and Intentional Misrepresentation

Taylor additionally asserts: "There are issues of fact in this case as to whether [Converse] has made false representations regarding its tenure system and whether [Converse] intended to deceive [Taylor] regarding the significance of her tenured status."  We disagree.

To prevail on her claims of fraud and intentional misrepresentation, Taylor must establish nine elements by clear and convincing evidence:

> In order to recover in an action for fraud and deceit, based upon misrepresentation, the following elements must be shown by clear, cogent and convincing evidence: (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; (9) the hearer's consequent and proximate injury.  Failure to prove any one of the foregoing elements is fatal to recovery.

*M. B. Kahn Const. Co. v. S.C. Nat'l. Bank of Charleston*, 275 S.C. 381, 384, 271 S.E.2d 414, 415 (1980); *see also Dailey Co. v. Amer. Instit. of Mktg. Sys., Inc.*, 256 S.C. 550, 553, 183 S.E.2d 444, 446 (1971) ("[W]here one promises to do a certain thing, having at the time no intention of keeping his agreement, it is a fraudulent misrepresentation of a fact, and actionable as such.").

For Taylor's claim to survive, she must produce evidence that Converse knowingly made a false representation to her.  Taylor contends: "A jury could find [Converse's] representations regarding tenure were false."  Taylor additionally maintains: "It is for a jury to decide whether [Converse's] statements about tenured professors in the Faculty Handbook were false, whether [Taylor's] reliance on [Converse's] tenure policy in the Faculty Handbook was reasonable, and whether [Converse] recklessly and intentionally disregarded its tenure policy when it "phased out" [Taylor's] employment and terminated her when she was fully

capable of, and remains fully capable of, teaching a wide variety of music and piano courses at Converse."

To the contrary, the evidence shows that Converse restricts the termination of tenured faculty to a few limited and extraordinary circumstances that are clearly delineated in the Faculty Handbook. Taylor testified that she received and reviewed the Faculty Handbook prior to accepting the position at Converse. Taylor points to no statement in the Faculty Handbook that is in conflict with the Board's action to terminate her employment for curricular exigency. Instead, she simply contends the Board knowingly misrepresented the existence of a curricular exigency. Such an allegation is without merit in light of the elimination of eight major programs of study and the significant cost-saving measures invoked by Converse during the period in which Taylor's employment was terminated.

Because Taylor is unable to show that Converse made a false representation to her, the court properly granted summary judgment in favor of Converse on Taylor's claims of fraud and intentional misrepresentation.

For the foregoing reasons, the circuit court's order is

**AFFIRMED.**[1]

**HUFF, THOMAS, and GEATHERS, JJ., concur.**

---

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.